# CENTER CAPITAL CORPORATION™

## MASTER LOAN AND SECURITY AGREEMENT NO. 21904

LENDER: *CENTER CAPITAL CORPORATION*
4 Farm Springs Road
Farmington, CT 06032

DATE : April 15, 1999
BORROWER: A & W Artesian Well Co.
ADDRESS: 706 St. Paul Street
CITY/STATE/ZIP: N. Smithfield, RI 02896

In consideration of the mutual covenants set forth in this Agreement, and intending to be legally bound, Lender and Borrower agree as follows:

1. **BORROWINGS; TERM.** Subject, in each instance, to Lender's prior written approval, the same to be granted or withheld at Lender's sole and exclusive discretion, it is the intention of Lender and Borrower that, from time to time, Borrower shall execute in favor of Lender one or more attachments hereto, each to evidence an additional indebtedness (each a "Loan", collectively the "Loans") owed by Borrower to Lender, each such attachment to be called a Loan Schedule (individually a "Schedule", if more than one, "Schedules"). Each Schedule shall incorporate the terms of this Agreement by reference and shall, in conjunction herewith, be deemed to be a separately enforceable contract.

This Agreement shall be effective on the date of execution by Borrower and shall continue in effect until such time as all of Borrower's Obligations (as defined below) have been fully performed or otherwise discharged.

2. **GRANT OF SECURITY INTEREST.** To secure the full and timely payment and performance of all obligations and indebtedness of Borrower to Lender arising hereunder and under each Schedule (the "Obligations"), Borrower hereby grants to and creates in favor of Lender a security interest in: (a) the goods, chattels, personal property and/or fixtures set forth in such Schedule, together with all replacements and substitutions therefor and accessories, attachments and accessions now or hereafter affixed thereto (collectively, the "Equipment"), (b) all proceeds (cash and non-cash), insurance proceeds and any and all chattel paper, accounts, contract rights and general intangibles arising from the sale, lease or other disposition of the Equipment (collectively, the "Proceeds") and (c) any Concurrent Payment or security deposit given by Borrower to Lender in connection with the Schedule. (A security deposit, if required, shall not bear interest, may be commingled with other funds of Lender and shall be immediately restored by Borrower if applied to any of the Obligations.)

As additional security for Borrower's performance of the Obligations, Borrower also hereby grants to Lender a security interest in all personal property, collateral, goods, accounts, chattel paper or other things in which Lender has or may acquire hereafter a security interest whether under any other of the Schedules or otherwise (the "Additional Collateral").

All of the things referred to in this Section 2 are at times hereinafter eferred to collectively as the "Collateral". Lender shall not be obligated to elease its security interest in any of the Collateral until all obligations existing ereunder or under the Schedule(s) are satisfied in full. Nothing contained erein shall be deemed to authorize Borrower to sell, lease or dispose of the :quipment.

3. **REPRESENTATIONS AND WARRANTIES.** Borrower represents ıat all financial and other information furnished to Lender was, at the time of elivery, true and correct and that, except as has been made known to Lender, o material adverse change in Borrower's financial or operating condition has ccurred since such information was provided. If Borrower is not an individual ıt is a corporation, partnership or other legal entity (an "Entity"): it is duly ganized, validly existing and in good standing under the laws of the jurisdiction its incorporation/organization, it is duly qualified to do business in each risdiction where any Equipment, is, or is to be, located, and it has full power ıd authority to perform its obligations under this Agreement and each chedule. The execution, delivery and performance by Borrower of this reement and each Schedule has been duly authorized by all necessary action on the part of Borrower, is not inconsistent with its Certificate of Incorporation, Charter, By-Laws or Articles of Organization, etc., does not violate any law or governmental rule, regulation or order applicable to Borrower, does not and will not contravene any provision of, nor constitute a default under, any indenture, mortgage, contract or other instrument to which it is bound, and upon execution and delivery hereof, will constitute a legal, valid and binding agreement of Borrower, enforceable in accordance with its terms. No action by any state, federal or other governmental authority or agency is required with respect to the execution, delivery and performance by Borrower of this Master Loan and Security Agreement or any Schedule. Borrower is not in default in any material respect under any loan agreement, mortgage, lease, deed or other similar agreement relating to the borrowing of monies or by which it or its assets may be bound, nor is Borrower in violation of any applicable law, rule regulation or order, and no action or proceeding which may materially adversely affect Borrower, its operational or financial condition, its assets or the Collateral is pending or threatened. Borrower has good, indefeasible and merchantable title to and ownership of the Equipment, free and clear of all liens and encumbrances except those of Lender. No representation or warranty by Borrower contained herein or in any certificate or other document furnished by Borrower pursuant hereto, in connection with the transactions contemplated hereunder, contains any untrue statement of material fact, or omits to state a material fact necessary to make it not misleading, or necessary to provide Lender with proper information as to Borrower and its affairs. THE FOREGOING REPRESENTATIONS AND WARRANTIES OF BORROWER SHALL BE EFFECTIVE AS OF THE DATE HEREOF, AND SHALL ALSO BE DEEMED CONTINUING AND EFFECTIVE AS IF RESTATED ON THE DATE OF EXECUTION OF EACH SCHEDULE.

4. **COVENANTS APPLICABLE TO THE COLLATERAL.** Borrower and Lender agree that, at all times during the term of this Agreement, the following provisions shall be applicable:

(a) Borrower shall maintain and keep its principal place of business and its chief executive office, as well as its records concerning the Equipment, at the address set forth above. Borrower shall keep the Equipment only at the above address or such other address as may be shown on the Schedule(s) as the Equipment location (the "Premises"). Borrower may change any of the foregoing locations only if it has given Lender thirty (30) days' prior written notice, any new location to be within the continental United States only.

(b) Borrower shall cause the Equipment to be maintained and preserved in good condition, repair and working order, ordinary wear and tear excepted, and shall permit the Equipment to be used only by trained and competent operators employed by Borrower, all in accordance with manufacturer's specifications and procedures, any applicable insurance requirements and any applicable governmental laws, rules or regulations, and available, together with the records relative thereto, for inspection by Lender, which shall be entitled to: (i) inspect the Equipment, (ii) copy the records relative to the Equipment, and (iii) upon Borrower's default, demonstrate the Equipment to third parties at the Premises or at such other location where the same may be located.

(c) Borrower shall not affix or permit the Equipment to become affixed to real estate or to any other equipment or goods.

(d) Borrower agrees to pay or reimburse Lender on demand for its costs and out of pocket expenses relating to any lien or similar searches undertaken by Lender, or any filing, recording, stamp fees or taxes arising from the filing or recording of any such instrument or statement and any other costs,



EXHIBIT
tabbies
A

expenses or charges incurred by Lender in docu... , administering and terminating this Agreement.

(e) Borrower shall retain use and ownership of and keep the Equipment, free and clear of all liens or encumbrances of any nature whatsoever. Borrower will defend such title against the claims and demands of all persons. Borrower will faithfully preserve and protect Lender's security interest in the Collateral and will, at its own cost and expense, cause said security interest to be perfected and continued, and for such purpose Borrower will, from time to time, at the request of Lender and at the expense of Borrower, make, execute, acknowledge and deliver, and file or record, or cause to be filed or recorded, in the proper filing places, all such instruments, documents and notices, including without limitation such financing statements and continuation statements, as Lender may deem necessary or advisable. Borrower will do all such other acts and things and make, execute, acknowledge and deliver all such other instruments and documents, including without limitation further security agreements, pledges, endorsements, assignments and notices, as Lender may deem necessary or advisable, from time to time, in order to perfect and preserve the priority of said security interest as a first lien security interest in the Collateral prior to the rights of all others.

(f) Borrower shall bear the entire risk of loss of, damage to, or destruction of, the Equipment. Borrower will insure the Equipment against all risk of loss in an amount not less than the full replacement value thereof, with insurers acceptable to Lender. Lender, its successors and assigns (as their interests may appear) shall be named as loss payee thereunder and the policies shall be endorsed in favor of Lender with such loss payable rider as Lender may designate. The original or certified copies of policies or evidence of insurance shall be delivered to Lender and shall provide that they may not be materially altered to Lender's detriment, cancelled or nonrenewed without thirty (30) days' written notice to Lender. Borrower hereby assigns to Lender all monies which may become payable on account of such insurance, including, without limitation, any return of unearned premiums which may be due upon cancellation of any such insurance, and directs the insurers to pay Lender any amount so due. Lender, its officers, employees and authorized agents and its successors and assigns, are hereby appointed attorneys-in-fact of Borrower, for the purpose of endorsing any draft or check which may be payable to Borrower in order to collect the proceeds of such insurance or any return of unearned premiums. Such appointment is irrevocable and is to be deemed coupled with an interest; however, the said power of attorney shall not be exercised so long as no Event of Default (as defined below) has occurred and is continuing. Insurance shall be maintained in accordance with this paragraph so long as any of the Obligations remains unpaid or unperformed.

(g) Borrower shall maintain public liability insurance in an amount not less than $300,000.00 and shall name Lender, its successors and assigns as additional insured with respect thereto in connection with the Equipment and its use. The original or certified copies of the policies or evidence of insurance shall be delivered to Lender and shall provide that they may not be cancelled without thirty (30) days' written notice to Lender. Insurance shall be maintained in accordance with this paragraph so long as any of the Obligations remains unpaid or unperformed.

(h) Upon the occurrence and during the continuation or existence of any Event of Default, Borrower shall, promptly upon demand by Lender, assemble the Collateral and make it available to Lender at the place or places reasonably designated by Lender. The right of Lender to have the Collateral assembled and made available to it is of the essence of this Agreement and Lender may, at its option, enforce such right by an action for specific performance.

(i) Lender shall have no duty to collect or protect the Collateral or any part thereof beyond exercising reasonable care in the custody of any Collateral actually in the possession of Lender.

(j) Borrower shall maintain a system of accounts reasonably acceptable to Lender and shall, within 120 days of the end of each fiscal year, deliver to Lender financial statements in such form as Lender may require. Borrower shall deliver such other financial information in such form, content and frequency as Lender may reasonably require and Borrower hereby grants to Lender the right to examine and audit the books of the business of Borrower at any reasonable time, to make copies thereof and to converse with Borrower's officers, employees, agents and independent accountants.

If Borrower fails to observe or perform ay of the Obligations, covenants or agreements contained in this Agreement, Lender may, in addition to any other remedy, take whatever action is deemed necessary to remedy such failure. Should such action require the expenditure of monies to protect and preserve Lender's interest in the Equipment (including but not limited to procurement of insurance, payment of insurance premiums, repairs, storage, transportation, removal of liens, etc.), the amount of such expenditure shall become one of the Obligations due and payable on demand with interest thereon at the lesser of 18% per annum or the highest rate allowed under applicable law until repaid. If Lender takes any action described in this paragraph, Lender shall not be liable to Borrower for damages of any nature whatsoever.

5. **LIMITATION OF LIABILITY; INDEMNIFICATION.** Lender shall not be liable for any indirect, special or consequential damages resulting from or arising out of, or alleged to arise out of, this Agreement or any breach hereof, nor shall Lender be liable for any direct, indirect, special or consequential damages or loss resulting from or arising out of, alleged to arise out of, the sale, financing, possession, delivery, non-delivery, installation, use, operation, repossession, or disposition of the Equipment, or from any defects in, failures, malfunctions, repairs, replacements or alterations thereof (collectively, the "Indemnified Matters"). Borrower hereby indemnifies and holds Lender, its employees, officers, directors and agents harmless from and against any and all claims or suits (including, but not limited to those sounding in negligence, strict liability or any similar doctrine, and patent or copyright infringement) for any loss, damage, or injury sustained or allegedly sustained by any person in connection with the Indemnified Matters and, in this connection, shall pay the costs of all legal fees and all out of pocket costs and expenses incurred by Lender. This covenant of indemnity shall continue in full force and effect from the date of Borrower's execution of this Agreement and shall survive the expiration, performance, acceleration, or termination of this Agreement and/or any Schedule.

6. **EVENTS OF DEFAULT.** The occurrence of any one or more of the following shall constitute an "Event of Default":

(i) The failure to pay any installment(s) due hereunder or under one or more of the Schedules on the due date therefor;

(ii) The breach of any term covenant, warranty or representation contained in this Agreement which is required to be performed or observed by Borrower and which failure is not cured to Lender's reasonable satisfaction within the (10) days after the giving of notice by Lender to Borrower of such failure;

(iii) The failure of Borrower to pay any other obligation or perform any other material agreement to Lender however arising;

(iv) With respect to the Borrower, the Equipment or a substantial part of Borrower's assets: (A) an application is made by Borrower or any other person for the appointment of a receiver, trustee, custodian, or assignee for the benefit of creditors, (B) a petition in Bankruptcy or under any similar law is filed, (C) there is a subjection to attachment, seizure, levy, writ or distress warrant, or D) the Equipment or the Borrower's assets come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors and, in the case of any such action by any third party, the same is not dismissed within sixty (60) days of being made or filed;

(v) The death or judicial declaration of incompetence of the Borrower, if an individual;

(vi) The death or judicial declaration of incompetence of any individual guarantor or the occurrence of any event described in item 6 (iv) above with respect to any guarantor, whether individual or otherwise;

(vii) Any attempted sale, dissolution or other disposition of: (A) the ownership of Borrower if Borrower is a sole proprietorship, or (B) a controlling interest in Borrower if Borrower is an Entity (as defined above);

(viii) There occurs a material, adverse change in the financial or operating condition of Borrower or that of any guarantor; or

(ix) Borrower ceases to conduct its business, or is enjoined, restrained or in any way prevented by court order or other process of law from conducting all or any material part of its business.

Upon the occurrence of an Event of Default, ..e gations under any or all Schedules may, at the option of Lender and without demand, notice, or legal process of any kind, be accelerated, and shall immediately become, due and payable.

7. **RIGHTS AND REMEDIES.** If one or more Events of Default shall occur and be continuing or shall exist then Lender shall have such rights and remedies in respect of the Collateral or any part thereof as are provided by the Uniform Commercial Code ("UCC"), and such other rights and remedies in respect thereof which it may have at law or in equity or under this Agreement, including, but not limited to, the right to: (i) enter any location(s) where the Collateral is located and take possession of it without demand or notice and without prior judicial hearing or legal proceedings, which Borrower hereby expressly waives, (ii) sell all or any portion of the Collateral at any broker's board or at public or private sale, with ten (10) days' prior written notice to Borrower, at such time or times and in such manner and upon such terms, whether for cash or on credit, as Lender, in its sole judgment, reasonably exercised, may determine, (iii) require Borrower, at its own expense, to assemble the Collateral pursuant to subsection 4(h) above and deliver it immediately, free and clear of all liens, encumbrances and rights of others, to a location specified by Lender (all Collateral to be in the same condition as when delivered to Borrower, ordinary wear and tear excepted), (iv) to require Borrower to pay all expenses of any sale, taking, keeping and storage of the Collateral, and all costs, including without limitation, all actual attorneys' fees incurred by Lender in its enforcement of the provisions of this Agreement, and (v) to apply the proceeds of such sale to all expenses and costs of repossession, storage, insurance, refurbishment and disposition of the Collateral, and any balance of such proceeds toward the payment of the Obligations in such order and manner of application as Lender may, from time to time, elect (and Borrower shall be liable to Lender for any deficiency). In addition to the foregoing; should Lender not have made full and final advancement of funds to or for the benefit of Borrower as contemplated hereby, Lender's obligation to make such advances shall, as between Borrower and Lender, immediately terminate without further notice to Borrower. Borrower, however, shall indemnify and hold Lender harmless in connection with any obligation to make advances theretofore incurred by Lender in connection with any Schedule.

Whenever any payment due hereunder or under a Schedule is not made by Borrower within ten (10) days of the date when due, Borrower shall pay to Lender upon demand an amount calculated at the rate of five cents per dollar of each such delayed payment, as an administrative fee to offset Lender's collection expenses, but only to the extent allowed by applicable law. Such amount shall be payable in addition to all amounts payable by Borrower as a result of the exercise of any of the remedies herein provided.

No remedy referred to in this Section is intended to be exclusive, but each shall be cumulative and in addition to any other remedy referred to above or otherwise available to Lender at law or in equity. The exercise or beginning of exercise by Lender of any one or more of such remedies shall not preclude the simultaneous or later exercise by Lender of any or all such other remedies and all remedies hereunder shall survive termination of this Agreement and/or the Schedule.

8. **GOVERNING LAW; JURISDICTION; VENUE; SERVICE OF PROCESS; WAIVER OF TRIAL BY JURY.** THIS AGREEMENT SHALL BE BINDING UPON LENDER ONLY WHEN EXECUTED BY LENDER IN THE STATE OF CONNECTICUT, AND SHALL BE GOVERNED BY THE LAWS OF THE STATE OF CONNECTICUT. BORROWER CONSENTS TO THE JURISDICTION OF ANY FEDERAL AND STATE COURT IN THE STATE OF CONNECTICUT WITH RESPECT TO ANY LEGAL ACTION COMMENCED HEREUNDER. HOWEVER, NOTHING CONTAINED HEREIN IS INTENDED TO PRECLUDE LENDER FROM COMMENCING ANY ACTION HEREUNDER IN ANY COURT HAVING JURISDICTION THEREOF. SERVICE OF PROCESS IN ANY SUCH ACTION SHALL BE SUFFICIENT IF SERVED BY CERTIFIED MAIL RETURN RECEIPT REQUESTED. TO THE EXTENT PERMITTED BY LAW, BORROWER WAIVES TRIAL BY JURY IN ANY ACTION BY OR AGAINST LENDER HEREUNDER.

9. **SEVERABILITY.** The provisions of this Agreement are intended to be severable. If any provision of this Agreement shall be held invalid or unenforceable, in whole or in part, in any jurisdiction, such provision shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without in any manner affecting the validity or enforceability thereof in any other jurisdiction or the remaining provisions hereof in any jurisdiction.

It is the intention of Borrower and Lender that, as to the indebtedness evidenced by any Schedule, Lender shall have and retain a first priority, purchase money security interest in and to the Equipment shown thereon. It is also the intention of Borrower and Lender that, in keeping with the nature of this Agreement, there exist cross-collateralization between and among each Schedule and the items of Equipment shown on all other Schedules, and otherwise as described in section 2 above. As such, in order to assure Borrower's prompt payment and performance hereunder and under each Schedule, Borrower has above granted to Lender a security interest in and to the Additional Collateral. Notwithstanding the foregoing, however, to the extent that any court of competent jurisdiction determines, contrary to the stated intention of the parties, that by Borrower's granting a security interest in the Additional Collateral to Lender, Lender's security interest in and to the Equipment shown on any Schedule ceases to be or, by virtue of the laws to be applied by such court, would cease to be a purchase money security interest, the grant of a security interest in and to the Additional Collateral shall, as to its capacity as additional collateral and not to its capacity as collateral of the purchase money variety under any Schedule, be deemed to be void ab initio.

10. **FURTHER ASSURANCES.** At the request of Lender, Borrower will do the following: (i) execute any written agreement or do any other acts necessary to effectuate the purposes and provisions of this Agreement, including, without limitation, obtain and deliver waivers, in form acceptable to Lender, from any party claiming (or who, in the opinion of Lender, may claim) any interest in any of the Equipment and (ii) execute any instrument or statement required by law or otherwise in order to perfect, continue or terminate the security interest of Lender in the Collateral. **Without limiting the foregoing, Borrower hereby authorizes and irrevocably appoints Lender as Borrower's attorney-in-fact, coupled with an interest, with full power of substitution, to apply for motor vehicle documents with Lender's lien noted thereon, to execute and file such UCC financing statements and motor vehicle title documents in all places where necessary to perfect or continue Lender's or any assignee's security interest in the Collateral or to obtain repossession title certificates. This power is delegable by Lender to an agent. Borrower agrees that a photocopy of this Agreement, when attached to any UCC-1 financing statement or similar document, shall be evidence upon which any filing officer may rely in connection with the Lender's authority to execute financing statements and similar documents on Borrower's behalf.**

11. **ASSIGNMENT.** Lender may assign this Agreement, or any Schedule, and all rights and powers existing hereunder and thereunder, in whole or in part, without notice to Borrower; Lender's assignee may reassign same without notice to Borrower and Borrower agrees to execute and deliver such documents as such assignee may reasonably request in connection with such assignment. Each assignee shall have all the rights but none of the obligations of Lender under this Agreement, and Borrower shall, upon receipt of proper notice thereof, recognize each such assignment and shall accept and comply with the directions or demands given in writing by any such assignee to the extent that they do not conflict with the terms hereof. Borrower shall not assert against the assignee any defense counterclaim or setoff that Borrower may have against Lender. However, nothing herein shall relieve Lender from its obligations to Borrower hereunder. This Agreement may not be amended without the prior written consent of the assignee. Upon any assignment of this Agreement, Lender or its assignee may record any instruments necessary to carry out the assignment.

12. **LENDER TERMINATION.** In the event that: (i) within 75 days of the Approval Date shown on the relevant Schedule (or such later date as Lender may agree to in writing, from time to time), full and final advancement of funds shall not have taken place in connection with any Schedule ("Advancement"), or (ii) prior to Advancement, any event which constitutes an event of default under section 6 above has occurred (it being expressly agreed that,for purposes of this section 12, Borrower shall have no right to cure with respect thereto), then Lender may, immediately upon giving notice to Borrower, terminate the relevant Schedule, any commitment issued in connection therewith, and its obligations existing thereunder.

13. **SUCCESSORS AND ASSIGNS.** This Agreement shall be binding upon Lender, Borrower and their respective successors and permitted assigns, except that Borrower may not assign or transfer any of its rights or obligations or any interest herein or in the Schedule(s) without the consent of Lender. In addition, this Agreement shall inure to the benefit of Lender, Borrower and their respective successors and permitted assigns except, however, that no assignee of Lender shall be entitled to any of the benefits of the Additional

Collateral provisions of section 2 above unless such assignee takes Lender's position in two or more of the Schedules executed hereunder, in which case the assignee takes the benefit thereof only to the extent the same applies to and among the Schedules taken by assignment. Unless otherwise required by its context, the word "Lender", where used in this Agreement, shall mean and include the holder of the Schedule originally issued to Lender, and the holder of such Schedule shall have the benefits of this Agreement the same as if such holder had been a signatory hereto.

14. **MISCELLANEOUS**. No delay or failure on the part of Lender in exercising any right, remedy, power or privilege hereunder shall operate as a waiver thereof or of any other right, remedy, power or privilege of Lender hereunder or any instrument or instruments now or hereafter evidencing the Obligations; nor shall any single or partial exercise of any such right, remedy, power or privilege preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights and remedies of Lender under this Agreement are cumulative and not exclusive of any rights or remedies which it might otherwise have. Neither the delivery of this Agreement, any Schedule nor any other document to Borrower by Lender shall be construed as an offer to lend money, nor shall any of same be binding upon Lender until accepted by Lender, the same to be evidenced by Lender's execution at its corporate office. See the terms of the Schedule for a discussion of the fact that the credit approval underlying this Agreement is not open-ended. BORROWER ACKNOWLEDGES THAT TIME IS OF THE ESSENCE IN THE PERFORMANCE OF THE OBLIGATIONS.

All section headings contained in this Agreement are for convenience only, and shall not in any way limit or affect the meaning or scope of this Agreement or its provisions. Any conflict between this Agreement and any Schedule shall be resolved in favor of the Schedule.

15. **NOTICES**. All notices or demands required or permitted under this Agreement shall be in writing and addressed to the attention of the intended recipient at the address shown above, or such other address as shall be made known to the other in writing in accordance with the provisions of this paragraph. Any such notice or demand shall be deemed received upon the sender's receipt of written acknowledgment from the recipient or, in the absence thereof, as follows: (i) immediately upon receipt, (ii) upon confirmation of delivery by commercial overnight courier, or (iii) (absent a return of the item) on the fifth day after being deposited in the United States mail, postage prepaid, and classified as certified mail, return receipt requested.

**IN WITNESS WHEREOF**, the parties hereto, by parties thereunto duly authorized and intending to be legally bound hereby, have executed and delivered this Agreement as of the date first above written.

**BORROWER:** A & W ARTESIAN WELL CO.

By: H. Allan Follett

H. Allan Follett
(Print Name)

Title: President

LENDER: *CENTER CAPITAL CORPORATION*

By:

MITCHELL D. WEISS
(Print Name)

Title: PRESIDENT & CEO